## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| HENRY DELORE RED CLOUD, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 20-608 |
| | ) | |
| v. | ) | Filed: March 9, 2022 |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The allegations of sexual abuse suffered by Plaintiffs in this action, who were at the time children or young teens, are horrific and heart-wrenching. They also are in part not merely unproven allegations. The alleged abuser or "bad man" at the center of Plaintiffs' Complaint—a doctor, Stanley Weber, to whom the United States entrusted the medical care of Native American children in the Indian Health System ("IHS")—was convicted in federal district court in September 2019 of sexually abusing four of the five Plaintiffs in this case. Sadly, it is not his only conviction. A year earlier, he was found guilty of sexually abusing two other Native American boys who were members of the Blackfeet Tribe in Montana. According to Plaintiffs, news reporting in early 2019 revealed that IHS officials knew of child sex abuse allegations involving Dr. Weber and did nothing to stop him.

On May 15, 2020, Plaintiffs filed this action, seeking compensation from the United States under the 1868 Treaty with the Sioux for the psychological and emotional harm that this government-appointed doctor inflicted on them. The Complaint asserts one claim for relief based on the Treaty's "bad men" provision, which mandates reimbursement for injuries to a tribe member's person or property caused by the acts of "bad men among the whites, or among other people subject to the authority of the United States." Treaty with the Sioux, Sioux Nation-U.S.,

art. I, ¶ 2, Apr. 29–Nov. 6, 1868, 15 Stat. 635 (hereinafter "Treaty").

It is this Court's task to determine whether, as Defendant argues, Plaintiffs' Complaint should be dismissed pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC") because their claim is beyond the statute of limitations. After careful consideration, for the reasons discussed below the Court agrees that Plaintiffs' "bad men" claim based on the wrongs committed by Dr. Weber is time-barred. Thus, it must grant Defendant's Motion to Dismiss to that extent. The Court, however, will provide Plaintiffs the opportunity to seek leave to file an amended complaint asserting a "bad men" claim based on the alleged wrongs of other IHS officials who purportedly concealed knowledge of or failed to report Dr. Weber's sexual abuse.

## I.  BACKGROUND

### A.   The 1868 Treaty with the Sioux

The 1868 Treaty with the Sioux, also called the Fort Laramie Treaty, sought to resolve conflicts between the Sioux and the white men and to establish the Great Sioux Reservation among the Black Hills of South Dakota. *See* Pls.' Opp'n to Def.'s Mot. to Dismiss at 18, ECF No. 11; *see also United States v. Sioux Nation of Indians*, 448 U.S. 371, 374 (1980). The Treaty contains two "bad men" provisions, the first providing a legal and financial remedy for wrongs committed by white men against the Sioux and the second for wrongs committed by the Sioux against "any one, white, black, or Indian, subject to the authority of the United States." Treaty, art. I, ¶¶ 2–3. The former states in relevant part:

> If bad men among the whites, or among other people subject to the authority of the United States, shall commit any wrong upon the person or property of the Indians, the United States will . . . proceed at once to cause the offender to be arrested and punished according to the laws of the United States, and *also re-imburse the injured person for the loss sustained*.

*Id.* ¶ 2 (emphasis added).

The Treaty is one of nine agreements between the United States and American Indian nations signed in 1868. *Tsosie v. United States*, 825 F.2d 393, 395 (Fed. Cir. 1987). While these treaties were signed over 150 years ago, the United States Court of Appeals for the Federal Circuit has affirmed that their provisions protecting Indians from "bad men" are not obsolete. *Id.* at 403 (declaring that the "bad men" provisions in the 1868 treaties are still in effect for wrongs committed by "bad men" against American Indians).

Although the Indian Tucker Act, 28 U.S.C. § 1505, grants the Court of Federal Claims exclusive jurisdiction over claims of American Indian tribes that would otherwise be cognizable in this court, the Tucker Act, 28 U.S.C. § 1491, affords the court jurisdiction over claims of individual tribe members. *See Hebah v. United States*, 428 F.2d 1334, 1338–39 (Ct. Cl. 1970) (considering the "bad men" provisions of one of the 1868 treaties to be within the scope of the Tucker Act as "express or implied contract[s] with the United States"); *see also Washington v. Wash. State Com. Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 675 (1979) ("A treaty, including one between the United States and an Indian tribe, is essentially a contract between two sovereign nations."). Under such jurisdiction, a judge of this court issued the first meritorious decision to a plaintiff under the Treaty's "bad men" provision in 2009. *See Elk v. United States* (*Elk II*), 87 Fed. Cl. 70, 83 (2009) (holding that the "bad men" provision entitled an Oglala Sioux member-prospective Army nurse to damages for "lost income, as well as pain, suffering and mental anguish," after an Army recruiter assaulted her on a Sioux reservation).

## B.    Factual History

Plaintiffs in this case include Henry Delore Red Cloud, Paul Harold True Blood, Eugene Hunts Horses III, Daniel Joseph Martin, and Fredrick Louis Gayton, all of whom are members of the Oglala Sioux Tribe. Pls.' Compl. ¶¶ 1–5, 10, 13, 16, 19, 22, ECF No. 1. Plaintiffs allege that Dr. Weber sexually abused them while he was employed as a pediatrician at the IHS hospital on

3

the Pine Ridge Reservation in Pine Ridge, South Dakota. *Id.* ¶¶ 6, 10, 13, 16, 19, 22. Plaintiffs'
allegations—which range from specific instances of abuse to a continuous pattern of abuse—span
a period beginning in 1995 and ending in 2010, during which time each Plaintiff was a minor. *Id.*
¶¶ 10, 13, 16, 19, 22.

The descriptions of Dr. Weber's abuse are harrowing. Some Plaintiffs reported that Dr.
Weber began abusing them during physical examinations at the IHS hospital, in which he
inappropriately touched their genitals and recta. *See, e.g.*, App. to Pls.' Opp'n to Def.'s Mot. to
Dismiss at 349, 353, 356–57, 358, ECF No. 11-2. The abuse reportedly escalated, in some cases
to oral and anal sex, and included instances of abuse in Dr. Weber's IHS housing. *See, e.g.*, *id.* at
353–54, 356–57, 358–59. The circumstances of Plaintiff True Blood's abuse are particularly
tragic, as he reported being abused three to four times a week for 10 years while at the same time
looking to Dr. Weber for both financial and emotional support when his family put him out. *See,*
*e.g.*, *id.* at 351.

Plaintiffs claim that Dr. Weber's abuse caused them persistent and continuous mental
health issues, including anxiety, depression, and psychological and emotional trauma. ECF No. 1
¶¶ 12, 15, 18, 21, 24. They assert that, because "all acts alleged . . . were committed within the
course and scope of [Dr. Weber's] employment incidental to . . . and/ or in furtherance" of the IHS
hospital, the United States is responsible for damages under the Treaty's "bad men" provision. *Id.*
¶¶ 6, 30–34. The Complaint specifically identifies Dr. Weber—and no other individual—as "a
'bad man' under the Treaty." *Id.* ¶ 33.

Each Plaintiff claims that "[as] a result of the psychologically self-concealing nature of
childhood sexual abuse" he "did not know, and could not have known, of the abuse, the injury,
and/ or the causal connection between the abuse and his injury" at the time the abuse was

happening. *Id.* ¶ 11; *see id.* ¶¶ 14, 17, 20, 23.  Each Plaintiff also alleges that he "was unaware of the wrongfulness of the actions of Dr. Weber [or of the events] until a date within six years of the institution of this action." *Id.*  Most Plaintiffs allege that they did not fully appreciate Dr. Weber's abuse, or the effects it had on their lives, until investigators began looking into other allegations of sexual abuse made against Dr. Weber.  *See, e.g.*, ECF No. 11-2 at 349, 352, 354.

These investigations, beginning in at least 2016 and 2017, were conducted by Curt Muller, a Special Agent with the U.S. Department of Health and Human Services' Office of Inspector General, and by *Wall Street Journal* reporter Christopher Weaver, which culminated in a PBS *Frontline* episode.  *See id.* at 13, 28.  Plaintiffs allege that news reporting in early 2019 publicly revealed multiple child sex abuse allegations against Dr. Weber while he was employed at an IHS clinic on the Blackfeet Reservation in Browning, Montana, between approximately 1992 and 1995. ECF No. 1 ¶ 25.  According to Plaintiffs, this reporting "revealed that the Indian Health Service had institutional knowledge of Dr. Weber's sexual abuse of minors in Montana and, despite this, failed to protect Plaintiffs from sexual abuse, assault and battery." *Id.*  Plaintiffs claim that they "were not aware and could not have been aware" of the Government's liability in this matter, as any information regarding Dr. Weber's misconduct and IHS officials' knowledge of it was "exclusively in the possession of the United States government and concealed until the aforementioned reporting" became public.  *Id.* ¶ 26.

As a result of the criminal investigations, in September 2018, a federal jury in Montana found Dr. Weber guilty of four of five counts of aggravated sexual abuse and attempted aggravated sexual abuse of children for crimes committed against the two Blackfeet Tribe members.  *See id.* ¶ 28; ECF No. 11 at 15; *see also* Redacted Jury Verdict, *United States v. Weber*, No. 4:18-cr-00014-BMM-1 (D. Mont. Sept. 6, 2018), ECF No. 123.  The following year, a federal jury in South

Dakota convicted Dr. Weber on five counts of aggravated sexual abuse and three counts of sexual abuse of a minor.  *See* ECF No. 1 ¶ 28; ECF No. 11 at 15; *see also* Redacted Jury Verdict, *United States v. Weber*, No. 5:17-cr-50033-JLV (D.S.D. Sept. 27, 2019), ECF No. 129.  As part of the latter case, Dr. Weber was found "guilty of abusing [Plaintiffs True Blood, Hunts Horses, Martin, and Gayton] on the Pine Ridge reservation."  ECF No. 1 ¶ 28.  For his offenses against Plaintiffs, Dr. Weber will serve five consecutive life sentences for aggravated sexual abuse and an additional 15 years for sexual abuse of minors.[1]  *See* Judgment, *United States v. Weber*, No. 5:17-cr-50033-JLV (D.S.D. Feb. 13, 2020), ECF No. 149.

## C.   Procedural History

On May 15, 2020, Plaintiffs filed their Complaint in this Court, seeking $100 million in compensatory damages under the Treaty's "bad men" provision.  ECF No. 1 ¶¶ 34, 36.  Defendant filed its Motion to Dismiss on September 14, 2020, asserting that Plaintiffs' claims were time-barred under 28 U.S.C. § 2501.  Based on the alleged dates of abuse and the dates Plaintiffs turned 18, it argued that 2016 was the latest any Plaintiff could have brought a timely claim.  Def.'s Mot. to Dismiss at 5, 7, ECF No. 7.  Plaintiffs filed their opposition on December 14, 2020, claiming that each Plaintiff timely filed his claim within six years of discovering that IHS officials concealed Dr. Weber's history as a pedophile and of becoming aware of the causal connection between his injury and its cause.  ECF No. 11 at 7.  Alternatively, Plaintiffs requested jurisdictional discovery and/or leave to amend their Complaint to clarify any deficiency raised in Defendant's Motion.  *Id.* at 7–8.  Defendant's Motion is now fully briefed and ripe for decision.  *See* Def.'s Reply, ECF No. 15; Pls.' Sur-Reply, ECF No. 21.  The Court held oral argument on September 15, 2021.

---

[1] Dr. Weber's sentence in South Dakota runs consecutively to his sentence in Montana, for which he is currently serving concurrent sentences totaling 220 months.  *See* Judgment, *United States v. Weber*, No. 4:18-cr-00014-BMM-1 (D. Mont. Jan. 18, 2019), ECF No. 145.

## II. DISCUSSION

**A.   Jurisdiction**

Congress gave the Court of Federal Claims limited jurisdiction over money claims against the United States. *Massie v. United States*, 226 F.3d 1318, 1321 (Fed. Cir. 2000). Specifically, the Tucker Act provides the Court with authority to render judgment over any claim "founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1). The Tucker Act, however, is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976). Thus, Plaintiffs must identify a substantive right in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). As explained above, the "bad men" provision of the Treaty, as well as the "bad men" provisions of similar treaties, provides a basis for Tucker Act jurisdiction. *See, e.g.*, *Elk v. United States* (*Elk I*), 70 Fed. Cl. 405, 405–07 (2006); *Locklear v. United States*, No. 18-1174C, 2019 WL 365770, at *5 (Fed. Cl. Jan. 29, 2019) (collecting cases).

This Court's jurisdiction is subject to the statute of limitations in 28 U.S.C. § 2501. *See Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1578 (Fed. Cir. 1988). Under § 2501, a plaintiff must bring an action within six years after his "claim first accrues." 28 U.S.C. § 2501. In a case where the plaintiff "was under legal disability . . . at the time the claim accrues," the statute extends the limitations period until three years after the legal disability ceases. *See id.* Courts have held that such exception includes the legal disability of infancy. *Evans v. United States*, 107 Fed. Cl. 442, 453 (2012) (citing, *inter alia*, *Wolfchild v. United States*, 101 Fed. Cl. 54,

75–76 (2011)).  Because it is a condition on the Government's consent to suit under the Tucker

Act, § 2501 sets forth a jurisdictional requirement that cannot be waived and is not susceptible to

equitable tolling.  *See John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 133–34 (2008);

*see also Levy v. United States*, 83 Fed. Cl. 67, 75 (2008).  Thus, if Plaintiffs' claim was filed after

the statute of limitations expired, it is beyond this Court's jurisdiction.  *Hopland*, 855 F.2d at 1582.

**B.**     **Standard of Review**

        When considering a motion to dismiss for lack of jurisdiction pursuant to RCFC 12(b)(1),

the Court must assume all undisputed factual allegations to be true and construe all reasonable

inferences in Plaintiffs' favor.  *See Scheuer v. Rhodes*, 416 U.S. 232, 236–37 (1974); *Estes Express*

*Lines v. United States*, 739 F.3d 689, 692 (Fed. Cir. 2014).  The Court, however, is not strictly

confined to the pleadings.  *Meyers v. United States*, 96 Fed. Cl. 34, 43 (2010).  If jurisdictional

facts are disputed, Plaintiffs may not rest on mere allegations; instead, they must produce

competent proof sufficient to support their allegations by a preponderance of evidence.  *See*

*McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936); *Taylor v. United*

*States*, 303 F.3d 1357, 1359 (Fed. Cir. 2002); *see also Reynolds v. Army & A.F. Exch. Serv.*, 846

F.2d 746, 748 (Fed. Cir. 1988).  If the Court determines that Plaintiffs have not met their burden

on the question of jurisdiction, "the only function remaining to the court is that of announcing the

fact and dismissing the [case]."  *Ex parte McCardle*, 74 U.S. 506, 514 (1869); *see* RCFC 12(b)(1),

(h)(3).

**C.**     **Plaintiffs' "Bad Men" Claim Based on the Acts of Sexual Abuse Committed by Dr.**
         **Weber Is Time-Barred and Thus Beyond the Court's Jurisdiction.**

        To defeat Defendant's statute of limitations argument, Plaintiffs must establish the

"'jurisdictional timeliness'" of their claim.  *Chemehuevi Indian Tribe v. United States*, 150 Fed.

Cl. 181, 193 (2020) (quoting *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir.

1998)).  Defendant argues that Plaintiffs have failed to meet this burden because their claim accrued at the time Dr. Weber committed the sexual abuse—the last occurrence of which happened in 2010, more than six years before Plaintiffs filed this action.  *See* ECF No. 7 at 7.  It contends that neither the accrual suspension rule, the legal disability exception, nor any mandatory administrative exhaustion requirement saves Plaintiffs' claim from being time-barred.  *See id.* at 4, 6, 9; *see also* ECF No. 15 at 15.

Plaintiffs allege that this action is firmly within the limitations period because their claim did not accrue until they recently became "aware of the existence of the facts that fix the liability of the United States and entitle [them] to institute an action."  ECF No. 1 ¶ 27.  According to Plaintiffs, Dr. Weber's abuse was inherently unknowable because Plaintiffs were victimized as children and thus were blamelessly ignorant at the time of the wrongfulness of Dr. Weber's misconduct.  ECF No. 11 at 42–43 (citing *Urie v. Thompson*, 337 U.S. 163 (1949)); *see, e.g.*, ECF No. 1 ¶ 11 (citing the "psychologically self-concealing nature of childhood sexual abuse").  The phenomenon of delayed discovery, they argue, is a common and reasonable response of child sex abuse victims.  ECF No. 11 at 44–45.  Plaintiffs further allege that IHS officials' concealing knowledge of Dr. Weber's prior history of child sex abuse prevented them from learning about other victims or about the officials' failure to stop their abuse until the alleged internal cover-up was exposed in early 2019.  *Id.* at 36–37; *see* ECF No. 1 ¶ 25.

The divide between the parties' arguments centers on the proper application of the accrual suspension rule to the particular wrong at issue in this case—child sex abuse—and whether, as Defendant contends, Plaintiffs are incorrectly arguing for the application of the tort-based discovery rule recognized by the Supreme Court in *Urie*.  ECF No. 7 at 7–8 n.2.  The Supreme Court recently noted that "[t]he phrase 'discovery rule' . . . has no generally accepted meaning."

9

*Rotkiske v. Klemm*, 140 S. Ct. 355, 360 (2019). But in the context of *Urie*, the rule was applied to suspend claim accrual until the plaintiff knew or had reason to know of his injury and that the defendant caused it. *Urie*, 337 U.S. at 170; *Rotella v. Wood*, 528 U.S. 549, 555 (2000) ("[D]iscovery of the injury, not discovery of the other elements of a claim, is what starts the clock."). Determining when Plaintiffs' claim accrued requires both a review of the language of § 2501 and the "bad men" provision creating Plaintiffs' cause of action, as well as an analysis of whether the accrual suspension rule, mandatory administrative exhaustion, or an exception to the statute of limitations applies. The Court addresses each in turn.

      1.    <u>Under § 2501 and the Treaty, a "Bad Men" Claim Typically Accrues When the Wrong Occurred.</u>

The Court begins, as it should, by analyzing the language of the statute of limitations set forth in § 2501 to discern how Congress intended it to operate. *Merck & Co., Inc. v. Reynolds*, 559 U.S. 633, 646–48 (2010); *see United States v. Kubrick*, 444 U.S. 111, 125 (1979) (holding that a court "should give [statutes of limitations] effect in accordance with what [it] can ascertain the legislative intent to have been").

Section 2501 states that a plaintiff must file an action in this court "within six years after such claim first accrues." 28 U.S.C. § 2501. It expands the six-year limitations period only for a plaintiff who was "[(1)] under legal disability or [(2)] beyond the seas at the time the claim accrue[d]." *Id.* Consistent with common parlance, the Federal Circuit has held that a claim first accrues for purposes of § 2501 "when all the events which fix the government's alleged liability have occurred and the plaintiff was or should have been aware of their existence." *Hopland*, 855 F.2d at 1577 (emphasis omitted) (citing *Kinsey v. United States*, 852 F.2d 556, 557 n.* (Fed. Cir. 1988)); *see Gabelli v. SEC*, 568 U.S. 442, 448 (2013) ("[T]he standard rule is that a claim accrues when the plaintiff has a complete and present cause of action." (internal quotation marks omitted)).

The parties do not seriously dispute that under this binding precedent a claim premised on an offensive act upon a person's body (such as an assault or battery) typically would first accrue under § 2501 when the alleged act happened. *See* ECF No. 7 at 6–7 (citing *Lucas v. United States*, 137 Fed. Cl. 628, 630 (2018)); ECF No. 11 at 11. Tying accrual of such claim to the occurrence of the wrongful act is also consistent with the language of the Treaty's "bad men" provision, which specifically creates a cause of action for "any wrong [committed] upon the person or property of the Indians." Treaty, art. I, ¶ 2; *see* ECF No. 1 ¶ 32 ("The sexual abuse . . . was a wrong committed upon the person of a Native American Indian."). The term "wrong" clearly contemplates criminal offenses committed against American Indians by non-Indians over whom the tribes had no jurisdiction and thus no means of remedy absent the Treaty. ECF No. 11 at 20–21 (citing, *inter alia*, *Ex parte Crow Dog*, 109 U.S. 556, 569 (1883)). When read together, Congress's intent is clear: except in cases involving an expressly stated exception to the six-year statute of limitations, a "bad men" claim under the Treaty first accrues when the wrong at issue is committed and the plaintiff knew or should have known of the act. Whether and when a plaintiff became aware of the wrongfulness of the act or the connection between the act and the injury is irrelevant. *See Goodrich v. United States*, 560 F.3d 1311, 1314 (Fed. Cir. 2009) ("The proper focus for statute of limitations purposes is upon the time of the defendant's *acts*, not upon the time at which the *consequences* of the acts became most painful." (cleaned up) (emphasis in original)).

That the alleged wrongs at issue in this case are acts of sexual abuse, and that Plaintiffs were minors at the time they were victimized, does not alter this conclusion. Indeed, courts have applied the same interpretation to the term "accrues" in the prior version of 18 U.S.C. § 2255, which provides a civil remedy for individuals who were, as minors, victims of certain federal child sex abuse offenses. *See, e.g.*, *Shovah v. Mercure*, 44 F. Supp. 3d 504 (D. Vt. 2014); *Singleton v.*

*Clash*, 951 F. Supp. 2d 578 (S.D.N.Y. 2013); *Kolbek v. Twenty First Century Holiness Tabernacle Church, Inc.*, No. 10-CV-4124, 2013 WL 6816174, at *13 n.13 (W.D. Ark. Dec. 24, 2013); *see also* ECF No. 15 at 14 (citing 18 U.S.C. §§ 2241(c) and 2243(a), violations of which are subject to a § 2255 claim). Like this Court's statute of limitations, the prior version of § 2255 similarly provided a limitations period running from the date "the right of action first accrues." 18 U.S.C. § 2255(b) (2013) (providing 10-year statute of limitations and an additional three years in the case of a person under a legal disability).[2]

In *Shovah*, the plaintiff brought suit under § 2255 approximately 20 years after a former priest allegedly abused him as a child. 44 F. Supp. 3d at 506. Reviewing the plain language of the then-current version of § 2255(b), the court held that a "§ 2255 claim accrues at the time of victimization, not after subsequent latent injuries present themselves." *Id.* at 511. As it explained, "[b]ecause a victim necessarily suffers actionable injuries under § 2255 at the time the criminal conduct occurs, the discovery of this criminal conduct is when the claim 'first accrues' for purposes of the statute of limitations." *Id.* (comparing § 2255 to the language of a Vermont statute that "expressly provides that the statute of limitations begins to run upon the discovery of the link between the sexual abuse and latent injuries"). In *Singleton*, which *Shovah* cited as persuasive authority, the plaintiffs brought suit under § 2255 approximately nine years (at the earliest) after they were allegedly abused by the defendant as children. *Singleton*, 951 F. Supp. 2d at 582–83. The court similarly held that "[t]he plaintiffs suffered their personal injuries under [§ 2255] at the time they became victims . . . . The dates on which the plaintiffs connected their psychological injuries to their victimizations [were] irrelevant to the dates on which their claims accrued . . . ."

---

[2] This language had been used consistently since the enacting legislation. *See* Pub. L. 99-500, 100 Stat. 1783-75 (1986), as amended by Pub. L. 99-591, § 703, 100 Stat. 3341-75 (1986) (providing six-year statute of limitations).

*Id.* at 588.

In both *Shovah* and *Singleton*, the courts declined to apply the discovery rule to determine the accrual date of the plaintiffs' claims.[3]  *See Shovah*, 44 F. Supp. 3d at 510; *Singleton*, 951 F. Supp. 2d at 951.  As *Singleton* explained, § 2255 expressly provided a legal disability exception that allowed minors an additional three years to sue after they turned 18.  951 F. Supp. 2d at 587.  "[C]ombined with Congress's failure to adopt a discovery rule in the face of statutes with explicit discovery rules and state sexual abuse statutes providing for application of a discovery rule," *Singleton* held that Congress did not intend to provide for a discovery rule under § 2255 "and none should be implied."  *Id.*  The court's hesitancy to accept the plaintiffs' discovery-rule argument, albeit in an action between private parties, is consistent with the Supreme Court's admonition that courts "be careful" not to interpret statutes of limitations that condition the Government's waiver of sovereign immunity "in a manner that would 'extend the waiver beyond that which Congress intended.'"[4]  *Block v. N. Dakota ex re. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983)

---

[3] At least two federal courts have applied the discovery rule to § 2255 claims when interpreting its statutory limitations period.  *See Stephens v. Clash*, 796 F.3d 281, 288 (3d Cir. 2015) (rule applied because statutory language did not reflect Congress's intent that it not apply); *Amy v. Anderson*, No. 5:16-CV-212 (MTT), 2017 WL 1098823, at *3 (M.D. Ga. Mar. 23, 2017) (rule applied because of the self-concealing nature of a § 2255 claim involving child pornography, similar to latent disease cases such as *Urie*).  Neither court's analysis, however, appears consistent with the claim accrual analysis performed in this Circuit or with the Supreme Court's more recent decisions.  *See Cloer v. Sec'y of Health & Hum. Servs.*, 654 F.3d 1322, 1340 (Fed. Cir. 2011); *Rotkiske*, 140 S. Ct. at 360 (describing the "expansive approach to the discovery rule" as a 'bad wine of recent vintage'" (quoting *TRW Inc. v. Andrews*, 534 U.S. 19, 37 (2001))).

[4] The Supreme Court has expressed similar hesitancy in cases involving non-waiver statutes.  *See TRW*, 534 U.S. at 20 (Fair Credit Reporting Act; "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent."); *see also Rotkiske*, 140 S. Ct. at 360–61 (Fair Debt Collection Practices Act; "The length of a limitations period 'reflects a value judgment concerning the point at which the interests in favor of protecting valid claims are outweighed by the interests in prohibiting the prosecution of stale ones.'  It is Congress, not this Court, that balances those interests." (citation omitted)).

13

(citation omitted).  The Federal Circuit recognized the same principle in *Cloer v. Secretary of Health and Human Services* when it refused to apply the discovery rule by implication to determine the accrual date of a claim under the Vaccine Act.  654 F.3d 1322, 1340 (Fed. Cir. 2011) (en banc) (holding Congress's use of a specific statutory date to commence a limitations period showed its refusal to adopt the plaintiff-oriented discovery rule).

Notably, in 2018, Congress amended § 2255, broadening the statute of limitations to expressly account for cases of delayed discovery.  Under the current version, a § 2255 claim is barred unless the plaintiff commences an action "not later than 10 years after the date on which the plaintiff reasonably discovers the later of—(A) the violation that forms the basis of the claim; or (B) the injury that forms the basis of the claim;" or "not later than 10 years after the date on which the victim reaches 18 years of age." *See* 18 U.S.C. § 2255(b)(1)–(2) (2018).  More recently, bipartisan legislation has been introduced in the United States Senate that would eliminate the statute of limitations altogether for § 2255 claims.  *See* Eliminating Limits to Justice for Child Sex Abuse Victims Act of 2021, S. 3103, 117th Cong. (2021); *see also* Press Release, U.S. Senate Committee on the Judiciary, Durbin, Blackburn Introduce Bipartisan Eliminating Limits to Justice for Child Sex Abuse Victims Act (Oct. 29, 2021) (noting the need to revise § 2255's statute of limitations to "reflect the current state of research on delayed disclosure" in the same way many states have expanded or eliminated similar limitations periods).[5]

Unfortunately for Plaintiffs, Congress has not exercised the same judgment in the context

---

[5] Separate legislation proposes the use of a federal grant program to incentivize states to revise statutes of limitations for criminal and civil actions related to child sex abuse. *See* No Time Limit for Justice Act, S. 3107, 117th Cong. (2021) (finding that "between 60 and 80 percent of victims of childhood sexual abuse wait until adulthood to disclose their abuse," *id.* §2(3)).  As Plaintiffs' counsel noted at argument, in 2003, Congress completely eliminated the statute of limitations for prosecutions of federal offenses involving child sex abuse. *See* Hr'g Tr. 25:24–26:5, ECF No. 25; Protect Act of 2003, P.L. 108-21, 117 Stat. 650, 660 (2003) (codified, as amended, at 18 U.S.C. § 3283).

of child sex abuse claims that may be subject to this Court's statute of limitations.  By its terms, the limitations period of § 2501 begins to run when the claim "first accrues," and the only exception permitted by Congress is, as relevant here, the legal disability of infancy.  28 U.S.C. § 2501.  The Court cannot apply § 2501 in this case in a way that extends it beyond these express limits or that reads into it exceptions that are not present.  *See Soriano v. United States*, 352 U.S. 270, 276 (1957).  Whether those bounds appropriately reflect the special considerations facing victims of child sex abuse is not for this Court to second-guess.  Unless and until Congress evinces a new intent, it must "simply enforce the value judgments made by Congress."  *Rotkiske*, 140 S. Ct. at 361.

2.    Plaintiffs Fail to Satisfy Either Requirement of the Accrual Suspension Rule.

In cases where the plaintiff did not know and reasonably could not have known that his claim existed, the Federal Circuit has applied the accrual suspension rule to determine the accrual date under § 2501.  Under that rule, the accrual of a claim against the United States will be suspended if the plaintiff shows either "that defendant has concealed its acts with the result that plaintiff was unaware of their existence or . . . that its injury was 'inherently unknowable' at the time the cause of action accrued."  *Ingrum v. United States*, 560 F.3d 1311, 1314–15 (Fed. Cir. 2009) (quoting *Martinez v. United States*, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc)).  The effect of the rule is to stop the commencing of the limitations period until the plaintiff knew or should have known of his claim.[6]  *Japanese War Notes Claimants Ass'n of Phil., Inc. v. United*

---

[6] The accrual suspension rule is itself based on an interpretation of the term "accrues" in § 2501.  *Petro-Hunt, L.L.C. v. United States*, 90 Fed. Cl. 51, 61 (2009) (citing *Martinez*, 333 F.3d at 1319) (explaining that the rule "derives directly from the meaning of the term 'accrues,' as used in section 2501, and, therefore, is viewed as a matter of statutory interpretation, rather than a form of equitable tolling"), *aff'd*, 862 F.3d 1370 (Fed. Cir. 2017).  "As a judicial interpretation of a legislative enactment, the rule is strictly and narrowly applied."  *Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985).

*States*, 373 F.2d 356, 358–59 (Ct. Cl. 1967) ("In this situation the statute will not begin to run until plaintiff learns or reasonably should have learned of his cause of action.").

The application of the accrual suspension rule to claims that regularly come before this Court is more or less a straightforward, although fact-specific, analysis. But how does it apply to a treaty claim (in essence, a contract matter) founded on acts of childhood sex abuse, allegations that—to date—have not often been raised in the types of non-tort actions filed in this court? Defendant argues for the straightforward approach, contending that Dr. Weber's abuse of Plaintiffs was not inherently unknowable to them nor concealed from them. Because the abusive acts were committed "upon the person," Defendant argues they were immediately evident to Plaintiffs, who had first-hand, contemporaneous knowledge of the events. *See* ECF No. 7 at 8–9 (quoting Treaty, art. I, ¶ 2); ECF No. 15 at 11–12. According to Defendant, whether they realized at the time the wrongfulness of Dr. Weber's acts or causally connected those acts to their injuries, or whether they could have known that IHS officials knew of Dr. Weber's history of sexual abuse, is immaterial under the Federal Circuit's accrual suspension cases. *See* ECF No. 15 at 10–14.

Plaintiffs argue that at bottom the accrual suspension rule applies a reasonableness standard. ECF No. 11 at 35. They assert that a host of factors—their young age, Dr. Weber's position of trust, the very nature of child sex abuse and the phenomenon of delayed discovery, and IHS's internal cover-up—all support the conclusion that Plaintiffs did not and reasonably could not know of their claim within the statute of limitations. *See id.* at 36–37, 42–44. Plaintiffs contend that, like the plaintiff in *Urie*, they "can only 'be held to be 'injured'" when the "accumulated effects" of Dr. Weber's abuse "'reasonably obtruded onto [their] consciousness.'" *Id.* at 45 (quoting *Urie*, 337 U.S. at 169); *see id.* at 44 ("Plaintiffs . . . did not realize that a harm had been done to them . . . and could not have so realized until the filth bubbled to the surface as the fruit of

16

the spoiled tree Weber planted." (citing *Japanese War Notes*, 373 F.2d at 359)).

Ultimately, the Court finds that the resolution of the parties' dispute lies in an evaluation of the facts. Applying binding precedent to those facts, the Court finds that Plaintiffs have not demonstrated that the accrual suspension rule applies.

### a. *Plaintiffs Have Failed to Show Their Claim Was Inherently Unknowable.*

In determining whether a claim was inherently unknowable, the Court considers under an objective standard whether Plaintiffs knew or reasonably should have known of their cause of action. *See Japanese War Notes*, 373 F.2d at 358–59; *Holmes v. United States*, 657 F.3d 1303, 1320 (Fed. Cir. 2011). The mere ignorance of legal rights is insufficient to suspend accrual. *Japanese War Notes*, 373 F.2d at 358–59; *see Menominee Tribe of Indians v. United States*, 726 F.2d 718, 720–21 (Fed. Cir. 1984). Nor is it necessary that Plaintiffs "obtain a complete understanding of all the facts," *Hopland*, 855 F.2d at 1577, or know "the full extent of the damage" inflicted, *Navajo Nation v. United States*, 631 F.3d 1268, 1277 (Fed. Cir. 2011), before the limitations period begins to run. Although in some cases it has been described as an inquiry notice test, *see Ingrum*, 560 F.3d at 1316–17, the Federal Circuit has clarified that inherent unknowability "includes an intrinsic reasonableness component," *Holmes*, 657 F.3d at 1320.

Plaintiffs rely primarily on *Urie*—a case in which the Supreme Court first applied the "inherently unknowable" standard to determine claim accrual. In that case, the plaintiff brought suit against the Missouri Pacific Railroad under the Federal Employers' Liability Act ("FELA"), alleging that it was liable for his injury caused by continuous inhalation of silica dust during his employment with the railroad. *Urie*, 337 U.S. at 165. After almost 30 years on the job, Urie became too ill to work and was diagnosed with silicosis weeks later. *Id.* at 170. The railroad argued that, given decades of silica dust exposure (which is commonly known to be dangerous),

17

Urie must have contracted the disease at some point outside of the three-year statute of limitations. *Id.* at 169.  The Supreme Court ruled in favor of Urie, holding that his claim could not have accrued prior to his diagnosis.  The Court emphasized that there was no suggestion Urie should have known he had silicosis at an earlier date, nor could anyone point to a specific date of injury given that the silica exposure occurred over a period of time.  *Id.* at 170.  Even if he was aware of the potential dangers of inhaling silica dust, the symptoms alerting Urie to the silicosis ravaging his body "had not yet obtruded on his consciousness."  *Id.* at 169 (noting that to allow claim accrual prior to diagnosis "would mean that at some past moment in time, unknown and inherently unknowable even in retrospect, Urie was charged with knowledge of the slow and tragic disintegration of his lungs").

Contrary to Defendant's suggestion, *Urie* is not entirely inapplicable to an accrual suspension analysis under § 2501.  ECF No. 15 at 13.  Indeed, *Urie* originated the accrual suspension rule applied in the Federal Circuit.[7]  *See Japanese War Notes*, 373 F.2d at 359 n.4 (citing *Urie*, 337 U.S. at 169).  That being said, the statute and injury at issue in *Urie* are distinguishable from this case.  As Defendant notes, FELA provided a railroad employee with a cause of action for an *injury* caused by the negligence of the railroad.  *See* ECF No. 15 at 13; *Urie*, 337 U.S. at 173–74.  The three-year statute of limitations began to run from the date the cause of action accrued.  *Urie*, 337 U.S. at 167.  The Court's analysis focused on whether the injury in Urie's case (silicosis) could reasonably have been discovered at an earlier date where there were

---

[7] *Urie* is also relied on by courts applying the discovery rule in civil actions alleging tortious injuries, most commonly medical malpractice claims.  *See* ECF No. 7 at 8 n.2.; s*ee also, e.g.*, *Quinton v. United States*, 304 F.2d 234, 241 (5th Cir. 1962) (medical malpractice action under Federal Tort Claims Act).  But courts also have applied discovery-rule principles in non-tort civil actions.  *See, e.g.*, *William A. Graham Co. v. Haughey*, 568 F.3d 425, 433–34 (3d Cir. 2009) (copyright infringement); *Allapattah Servs., Inc. v. Exxon Corp.*, 157 F. Supp. 2d 1291 (S.D. Fla. 2001) (breach of contract).

no allegations Urie should have known of his disease before diagnosis and there was no specific date of injury. *Id.* at 169–70.  By contrast, this case deals with a cause of action that accrues when a *wrong* against the Native American's person is committed.  *See* 28 U.S.C. § 2501; Treaty, art. I, ¶ 2.  And unlike prolonged workplace exposure to a dangerous substance, in this case, the "bad man" who perpetrated the wrong and the dates on which the wrong occurred have been identified. The court in *Singleton* similarly distinguished *Urie*, holding that it did not "deal[] with the issues presented" in the plaintiffs' § 2255 action against their childhood abuser.  *Singleton*, 951 F. Supp. 2d at 590 (emphasizing that "the plaintiffs knew that the defendant had engaged in sexual activity with each of them," *id.* at 590 n.11).

The Court has no reason to question at this stage, and Defendant does not dispute, the research provided by Plaintiffs that discusses the tragic effects of childhood sexual abuse, the impact such traumatic events have on young victims' processing of memories of the abuse, and their willingness to come forward to disclose the abuse.  *See* ECF No. 11-2 at 361–68.  Section 2501, however, does not explicitly recognize these considerations (other than the legal disability of infancy), and Defendant correctly notes that Plaintiffs have identified no judge-made presumption that acts of child sex abuse are inherently unknowable in all cases.  *See* ECF No. 7 at 8 & n.3.  Indeed, courts grappling with statute-of-limitations questions for claims of child sex abuse—whether applying the discovery rule or not—look to the particular facts alleged by the plaintiffs.[8]  *See, e.g.*, *Shovah*, 44 F. Supp. at 510, 512–13; *Singleton*, 951 F. Supp. 2d at 588–89; *Stephens v. Clash*, 796 F.3d 281, 289 (3d Cir. 2015).

---

[8] While the Court of Federal Claims does not entertain tort claims, and thus largely lacks on-point precedent to determine accrual for child sex abuse-related claims, decisions in other jurisdictions applying statutes of limitations with similar accrual language may provide guidance. In general, courts have identified two types of cases concerning child sex abuse: 1) cases where a plaintiff claimed he knew of the abuse at or before reaching the age of majority but was unaware of the causal connection between the abuse and subsequent physical and psychological problems,

Here, the Complaint alleges that each Plaintiff "did not know, and could not have known, of the abuse, the injury, and/ or the causal connection between the abuse and his injury" because of "the psychologically self-concealing nature of childhood sexual abuse."  ECF No. 1 ¶ 11; *see id.* ¶¶ 14, 17, 20, 23.  Each further alleges that he was "unaware of the wrongfulness of the actions of Dr. Weber [or of the events] until a date within six years" of filing this action.  *Id.*  No Plaintiff, however, alleges that he was unaware of the acts of abuse themselves at the time they occurred.

While the Complaint lacks detailed information regarding Plaintiffs' delayed discovery claim, Plaintiffs provided numerous materials with their opposition brief, including excerpts of testimony presented at Dr. Weber's criminal trials, sworn affidavits by each Plaintiff, and reports of a licensed clinical psychologist who interviewed Plaintiffs.  *See* ECF No. 11-2 at 1–11, 317–32, 349–60.  Based on the Court's review, this evidence objectively shows that each Plaintiff had knowledge of the abusive acts before the limitations period for their claim expired.

To be sure, in their affidavits and clinical interviews, Plaintiffs explained that over the years they have avoided thinking about the sexual abuse by blocking out or bottling up painful memories, sometimes by self-medicating with alcohol and drugs.  *See id.* at 350, 357, 359.  Some Plaintiffs described burying and forgetting about the abuse, with no reason to revisit the events until the more recent criminal and journalistic investigations triggered memories.  *See id.* at 321 (¶ 5), 324 (¶ 6), 327 (¶ 3).  Still others stated that they forgot about the abuse for years.  *See id.* at 331 (¶ 5), 359.  The Court has no doubt that these types of coping measures are a reasonable response to the

---

and 2) cases where a plaintiff claims the abuse-incurred trauma caused him to repress—or completely lack recollection or knowledge of—the sexual abuse until shortly before filing suit. *See Johnson v. Johnson*, 701 F. Supp. 1363, 1367 (N.D. Ill. 1988) (applying Illinois state law). Type 1 cases generally do not suspend claim accrual, as courts have largely declined to consider acts committed on a child's person to be reasonably unknown where memories exist but causal connection is lacking, whereas Type 2 cases more commonly suspend claim accrual, as courts have acknowledged that repression is akin to the *Urie* plaintiff's blameless ignorance. *See Baily v. Lewis*, 763 F. Supp. 802, 804–07 (E.D. Pa. 1991) (applying Pennsylvania state law).

disturbing events that Plaintiffs suffered, but they do not rise to the level of demonstrating that Plaintiffs lacked recollection or knowledge of the abuse. *See Hopland*, 855 F.2d at 1579 (explaining that "the determinative issue [is] whether the Band as an entity could be considered to be unaware" of the events giving rise to its cause of action); *Young v. United States*, 529 F.3d 1380, 1385 (Fed. Cir. 2008) ("It is a plaintiff's knowledge of the facts of the claim that determines the accrual date.").

Indeed, some statements conveyed that Plaintiffs knew something was not right about what Dr. Weber was doing to them. *See* ECF No. 11-2 at 353 (Plaintiff Hunts Horses; describing an incident during a physical in which Dr. Weber "'started touching my middle parts . . . [then] grabbed my nut-sack, grabbed my penis, and started looking at them. I thought 'this isn't right' but didn't say anything.'"); *id.* at 169–70. Understandably, they described during that period feeling shame or blaming themselves for letting the abuse happen. *See id.* at 20 ("PAUL: *[subtitles]* Here this guy was offering me money so I could find a place to sleep. All I had to do was a few f----- up favors. And at the time, it just made me feel super f----- up." (alteration in original)); *see also id.* at 148, 158–59, 196–97.

Others described observing signs of physical injury at the time of the abuse, *see id.* at 68–69 (Plaintiff Martin; testifying that he observed blood in his stool after an incident where Dr. Weber sexually abused him at the IHS hospital); *id.* at 353–54, as well as psychological or emotional damage, *see id.* at 349 ("[Red Cloud] also reported that his life took a downward spiral after [the abuse began].""); *id.* at 359 ("After the abuse, [Plaintiff Gayton] said that he had some disturbing dreams about the abuse . . . ."). Most notably, some Plaintiffs reported that they told other people about Dr. Weber's abuse at the time, including a tribal law enforcement officer. *See id.* at 21 ("PAUL: . . . I did talk to [Officer Dan Hudspeth] about, like, that whole situation."); *id.*

21

at 72–73 (Plaintiff Martin; testifying that he told a friend on the reservation of the abuse and that the friend kept his secret); *id.* at 196 (Plaintiff Hunts Horses; testifying that prior to speaking with Special Agent Muller he told a young girl that something bad had happened to him as a child but did not tell her specifics).  Moreover, Plaintiffs Red Cloud, True Blood, and Gayton assaulted Dr. Weber in 2006 because of the abuse he inflicted on them.  *See id.* at 349 ("[Red Cloud] stated that 'my friends told me about their abuse—that's what triggered me.' . . . after this, [Red Cloud] went to Dr. Weber's house and 'beat him up good.'"); *id.* at 359 ("After the memories surfaced, [Gayton] reported that he and 2 others broke into Dr. Weber's house . . . [and] 'wound up beating him up.'"); *id.* at 22, 139.  After the assault, Dr. Weber gave Plaintiffs money and begged for his life, but despite being "beaten to the point of needing skull X-rays," *id.* at 23, he would not identify Plaintiffs as the assailants to IHS officials, *see id.* at 22–23.

These facts, all undisputed and drawn from their own statements, demonstrate that the wrongs committed by Dr. Weber were not inherently unknowable to Plaintiffs.  They possessed knowledge of the critical facts that a wrong had been committed against their person and that Dr. Weber was the perpetrator.  *See Shovah*, 44 F. Supp. at 512; *Singleton*, 951 F. Supp. 2d at 588; *Stephens*, 796 F.3d at 289.  In other words, while Plaintiffs are unquestionably blameless victims of Dr. Weber's abuse, they were not ignorant of it.  As unfortunate as it is in this case, under Federal Circuit precedent, that is all that is necessary to start the clock on the statute of limitations. *See Hopland*, 855 F.2d at 1577.

Certainly, each Plaintiff also attests that at the time of the abuse he did not fully understand the wrongfulness of Dr. Weber's acts and, in fact, was led to believe that they were a normal part of medical treatment.  *See* ECF No. 11-2 at 317 (¶ 3), 318 (¶ 5), 321 (¶ 5), 324 (¶ 6), 326–27 (¶¶ 3–4), 328 (¶ 7), 331 (¶ 4), 349, 351.  Plaintiffs uniformly explain that not until much later in their

lives did they fully appreciate the atrocious nature of Dr. Weber's misconduct or connect it to the psychological damage that has resulted. *See id.* at 317 (¶ 3), 321 (¶ 5), 324 (¶ 6), 331–32 (¶ 6). The Federal Circuit, however, has refused to recognize that a plaintiff's lack of knowledge of his legal rights or his failure to understand the extent of his injury suspends claim accrual. *See Catawba Indian Tribe of S.C. v. United States*, 982 F.2d 1564, 1571–72 (Fed. Cir. 1993) (declining to apply accrual suspension rule where the relevant facts underlying the tribe's claim were known, even though the legal consequence of those facts was misunderstood); *Rosales v. United States*, 89 Fed. Cl. 565, 578 (2009) (holding that a realization of new or greater consequences of an injury will not suspend claim accrual). Moreover, Congress already accounted for the unique nature of claims that arise during childhood by including an exception in § 2501 to extend the limitations period for the legal disability of infancy. *See* 28 U.S.C. § 2501.

Although the Court is sympathetic to Plaintiffs' circumstances and their more recent coming-to-terms with the abuse and resulting psychological harms caused by Dr. Weber, both the facts and the law of this Circuit compel the finding that Plaintiffs' claim was not inherently unknowable.

      b. *Plaintiffs Fail to Show That the Government Concealed Acts Resulting in Ignorance of Their Cause of Action.*

Plaintiffs also fail to demonstrate that the Government concealed Dr. Weber's acts of sexual abuse such that Plaintiffs did not and could not know of their cause of action. Plaintiffs claim that "the facts which fix the liability of the United States government were exclusively in the possession of the . . . government" and that, as a result, they were unaware of their claim until the 2019 reporting "revealed that United States officials and employees knew of the danger posed to Native American children and did not act." ECF No. 1 ¶¶ 25–26. Defendant disputes this allegation, arguing that Plaintiffs assert a claim based on a "wrong" committed "upon the[ir]

person," ECF No. 7 at 9 (quoting Treaty, art. I, ¶ 2), which was "open and notorious and, necessarily, immediately evident to those present," *id.*  According to Defendant, "[t]he fact that officials of the United States not present during the incidents might have subsequently become aware of and investigated these incidents does not equate to concealment *eo tempore*." *Id.*

To satisfy the accrual suspension rule on the grounds of concealment, a plaintiff must "show that defendant has concealed its acts with the result that plaintiff was unaware of their existence." *See Welcker v. United States*, 752 F.2d 1577, 1580 (Fed. Cir. 1985).  Concealment generally requires the presence of "some trick or contrivance intended to exclude suspicion and prevent inquiry," as opposed to mere inaction or silence. *Woods v. Carpenter*, 101 U.S. 135, 143 (1879); *see LaMear v. United States*, 9 Cl. Ct. 562, 570 (1986), *aff'd*, 809 F.2d 789 (Fed. Cir. 1986).  The concealment doctrine requires that a plaintiff be entirely unaware of the acts underlying his cause of action because the defendant has obfuscated material facts. *See, e.g.*, *Shoshone Indian Tribe of Wind River Rsrv., Wyo. v. United States*, 672 F.3d 1021, 1032–33 (Fed. Cir. 2012) (finding that the Government's alleged omissions and misstatements "did not prevent the Tribes from being aware of the material facts that gave rise to their claim" and thus could not suspend claim accrual); *L-3 Commc'ns Integrated Sys., L.P. v. United States*, 79 Fed. Cl. 453, 463–64 (2007) (applying the accrual suspension rule where a plaintiff discovered a contract had been improperly awarded only after a report revealed procurement irregularities previously concealed by a government agent).  Likewise, a plaintiff does not show concealment where subsequent revelations provide him only "with additional ammunition with which to pursue the claim." *Martinez*, 333 F.3d at 1319 (holding that the plaintiff's discovery of evidence demonstrating that the basis for his military discharge was fabricated did not demonstrate concealment).

Here, accepting as true Plaintiffs' allegations that IHS officials concealed Dr. Weber's

history of sexual abuse, the evidence before the Court belies the contention that such concealment resulted in Plaintiffs' ignorance of their claim.  Plaintiffs may have first learned from the 2019 media reports that IHS officials knew of sexual abuse allegations made against Dr. Weber before he was transferred to the Pine Ridge Reservation.  They, however, do not allege (and do not demonstrate) that such facts prevented them from knowing of Dr. Weber's abusive acts against them personally.  *See, e.g.*, ECF No. 1 ¶¶ 25–26; ECF No. 11-2 at 318 (¶¶ 4–5).  Indeed, it would seem impossible for Defendant to conceal, or exclusively possess information about, wrongs that were perpetrated on each Plaintiff's body and were known to Plaintiffs at the time.  *See* ECF No. 1 ¶ 32.  As with inherent unknowability, Plaintiffs' being unaware of the wrongfulness of the abuse or the connection between the abuse and the harm it has caused is insufficient.  *See Shoshone*, 672 F.3d at 1031–32.  Whether Plaintiffs fully understood the lasting significance of their abuse only after the public reporting in 2019 is irrelevant.  *Martinez*, 333 F.3d at 1319.  To prove concealment, Plaintiffs must show they had no way of knowing of Dr. Weber's abuse because of the Government's actions.  Here, Plaintiffs were eyewitnesses to the "wrong" at issue in this case. Thus, Plaintiffs fail to prove concealment for purposes of suspending the accrual of their claim.

      3.    <u>Accrual of Plaintiffs' Claim Is Not Affected by Administrative Exhaustion.</u>

Defendant raises another ground that could potentially postpone the accrual date of Plaintiffs' claim: failure to exhaust administrative remedies.  ECF No. 15 at 15 (citing *Martinez*, 333 F.3d at 1304 (holding that claims involving disputes subject to mandatory administrative proceedings will not accrue until those proceedings conclude)).  The parties, however, do not dispute that Plaintiffs have satisfied the Treaty's administrative claims procedure.

The Treaty requires that the United States reimburse an injured Native American under the "bad men" provision "upon proof made to the agent, and forwarded to the Commissioner of Indian

Affairs." Treaty, art. I, ¶ 2.  As the court noted in *Elk I*, unlike other treaties between the United States and American Indian nations, the Treaty "neither specifies the particulars of the proof that should be supplied nor indicates that the claimant must wait any particular time for an agency to respond to her claim." 70 Fed. Cl at 407.  The Treaty's administrative claims procedure is therefore "satisfied by submitting a notice of claim or notice of intent to file suit to the Assistant Secretary of the Interior for Indian Affairs, the modern equivalent to the Commissioner of Indian Affairs." *Flying Horse v. United States*, 696 F. App'x 495, 497 (Fed. Cir. 2017) (denying right to pursue an action under the Treaty because the plaintiff failed to submit required notice to the Interior Department); *see Elk I*, 70 Fed. Cl. at 411.  A plaintiff is not required to "await an agency decision before coming to this court." *Elk I*, 70 Fed. Cl. at 410.

In the case at hand, Plaintiffs allege that each "provided a detailed Statement of Claim for damages in writing to the reservation superintendent and to the assistant secretary of the Interior for Indian Affairs in Washington, D.C., which were then forwarded on or before March 4, 2020 to the United States Department of Interior."  ECF No. 1 ¶ 35.  Plaintiffs also provided a copy of these written claim notices during briefing.  *See* Ex. A, Pls.' Mot. to Strike (letter dated December 31, 2019, submitting claims for three of five Plaintiffs), ECF No. 18-1; Ex. B, Pls.' Mot to Strike (letter dated February 28, 2020, submitting claims for remaining two Plaintiffs), ECF No. 18-2.  Plaintiffs allege that the Government responded by letter dated March 30, 3020, stating that it would not consider Plaintiffs Martin and Gayton's claims.  ECF No. 1 ¶ 35.  Defendant confirmed this allegation in its briefing, explaining that Interior forwarded the two claims to the Department of Health and Human Services because it construed them as claims under the Federal Tort Claims Act.[9]  *See* ECF No. 15 at 16.  It is unclear whether Interior ever responded to Plaintiffs' first claim

_____

[9] Interior's position is seemingly contradicted by the face of the claims.  Page one of each letter reads: "Please be advised that claims are being made under the Federal Tort Claims Act,

notice related to Plaintiffs Red Cloud, Hunts Horses, and True Blood.  Regardless, because the

Treaty does not further specify procedures for Interior to respond to a claim, mere notice suffices.

*Hebah*, 428 F.2d at 1340; *see Elk I*, 70 Fed. Cl. at 411.

Accordingly, Plaintiffs have met the Treaty's minimal exhaustion requirements.  The Court

finds that this issue does not impact the question of whether their claim in this Court is time-barred.

4.    Plaintiffs Did Not File Suit Within Three Years After Reaching the Age of
      Majority.

Because Plaintiffs have not demonstrated a reason to suspend claim accrual, the Court turns

to the exceptions in § 2501.  The only exception to the six-year limitations period applicable to the

case at hand—and thus the only one permitted by Congress—is the legal disability of infancy.  28

U.S.C. § 2501; *see* ECF No. 1 ¶¶ 11, 14, 17, 20, 23 (asserting that the alleged abuse occurred

during childhood).  For plaintiffs with legal disabilities, § 2501 creates an additional three-year

period in which to bring a claim.  *Marcos v. United States*, 106 F. Supp. 172, 176 (Ct. Cl. 1952)

("The effect of the disability provision . . . is *not to suspend* the running of the [s]tatute during the

period that the disability continues, but . . . to create a designated *additional* period, a period of

grace.") (emphasis in original), *overruled on other grounds by Compania Maritima v. United*

*States*, 145 F. Supp. 935 (Ct. Cl. 1956).

Only a serious impediment qualifies for the legal disability exception, which was "designed

to provide relief from some personal handicap or impediment affecting the individual litigant and

---

*Bivens*, and **Article I of the Treaty with the Sioux dated April 29, 1868**."  ECF No. 18-1 at 1
(emphasis added); *see* ECF No. 18-2 at 1.  The attachments to the letters include summaries of
each claim theory, including one under the heading: "The Bad Man [C]lause of the Sioux Treaty."
*See, e.g.*, ECF No. 18-1 at 6.  Even Defendant's counsel noted that Interior's position would be
hard to defend in a case seeking review of agency action, which this is not.  *See* Hr'g Tr. at 18:20–
22.  Unfortunately then, counsel was unable to give the Court any information on the status of
Interior's administrative review process, calling it "up in the air."  *Id.* at 17:22–23.  Of course, the
statute of limitations issue raised in Defendant's Motion does not prevent Interior from considering
Plaintiffs' administrative claims.  *See id.* at 17:19–25.

preventing him from bringing a timely suit." *Goewey v. United States*, 612 F.2d 539, 544 (Ct. Cl. 1979) (citing *Marcos*, 106 F. Supp. at 176).  Although § 2501 does not define "legal disability," prior decisions have recognized various impediments that would impair a plaintiff's ability to access the court, including the legal disability of infancy.  *See, e.g.*, *Evans*, 107 Fed. Cl. at 453. When the disability ceases, either because the condition subsides or the plaintiff reaches the age of majority, the claim accrual clock begins to run, giving the plaintiff three years to timely file his complaint.  *Goewey*, 612 F.2d at 546.  A plaintiff reaches majority at the age of 18.  *See Age*, *Black's Law Dictionary* (11th ed. 2019).

Accordingly, the limitations period for Plaintiffs' claim expired in 2016, at the latest, three years after Plaintiff Hunts Horses turned 18 (2013) and six years after the latest instance of sexual abuse occurred (2010).[10]  Because Plaintiffs filed their Complaint in 2020, at least four years beyond the statute of limitations, the Court lacks jurisdiction to entertain their claim.

*     *     *

The Court appreciates the harsh result of this Opinion, which denies Plaintiffs one available cause of action to remedy the harm they suffered at the hands of a person who served not only in

---

[10] The facts relevant to calculating the limitations period are summarized as follows:

| Plaintiff | Allegations | Yr. of Birth | Yr. of Majority | SOL Expired |
|---|---|---|---|---|
| Red Cloud | Sexual abuse, assault, and battery in four events during 2000–2003, from age 11 to ages 13 or 14 | 1989 | 2007 | 2010 |
| True Blood | Sexual abuse, assault, and battery once a week during 1999–2008, from ages 12 to 21 | 1987 | 2005 | 2014 |
| Hunts Horses | Sexual abuse, assault, and battery in several events during 2008–2010, from ages 13 to 15 | 1995 | 2013 | 2016 |
| Martin | Sexual abuse, assault, and battery during every IHS visit from 1995–2000, from age 9 to ages 13 or 14 | 1986 | 2004 | 2007 |
| Gayton | Sexual abuse, assault, and battery in two events during 2003–2004, from ages 12 to 13 | 1991 | 2009 | 2012 |

*See* ECF No. 1 ¶¶ 10, 13, 16, 19, 22.

a position of trust but also with the imprimatur of the United States Government.  As likely shown by the trend in federal (and state) legislation, claims premised on childhood sexual abuse may cry out for a loosening of the statute of limitations.  That trend has not reached § 2501, however.  And as Justice Scalia explained, such cries "are properly directed not to [the court], but to Congress, whose job it is . . . to strike the balance between remediation of all injuries and a policy of repose." *TRW Inc. v. Andrews*, 534 U.S. 19, 38 (2001) (Scalia, J., concurring).

**D.      The Complaint Does Not Plead A "Bad Men" Claim Against Other IHS Officials.**

Although Plaintiffs' "bad men" claim based on the abusive acts of Dr. Weber is beyond the Court's jurisdiction, Plaintiffs argue that they have raised a separate claim against known and unknown IHS officials who allegedly knew of and concealed Dr. Weber's history of child sex abuse.  *See* ECF No. 11 at 24.  In their opposition brief, they contend that these IHS officials "caused a 'wrong upon the person of an Indian' under the treaty and are, therefore, bad men" because they either failed to comply with criminal reporting duties or discovered Dr. Weber's criminal activity and covered it up.  *Id.* at 35–36 (citations omitted).  Because they did not know of IHS's internal knowledge and could not have known about it until it was publicly reported in 2019, Plaintiffs argue that any claims against other IHS officials are well within the statute of limitations.  *Id.* at 24, 36–37.  Defendant does not dispute that any such claim would be within the limitations period and thus the Court's jurisdiction.  Rather, it argues that Plaintiffs did not plead a "bad men" claim based on the actions of other IHS officials and, in any event, such allegation would fail to state a cognizable claim.  ECF No. 15 at 19–22.

The Court agrees in part with Defendant.  Plaintiffs' Complaint plainly alleges that IHS officials had institutional knowledge that Dr. Weber sexually abused children while working in Montana but failed to protect Plaintiffs and, as a result, facilitated and caused the abuse suffered by them.  ECF No. 1 ¶ 25.  But the Complaint also plainly alleges a claim against *only* Dr. Weber—

and no other individual—as a "bad man" under the Treaty.  *See id.* ¶¶ 33–34.  As Defendant correctly notes, "it is 'axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  ECF No. 15 at 20 (quoting *Davis v. United States*, 108 Fed. Cl. 331, 337 n.4 (2012)).

At oral argument, Plaintiffs' counsel cited a lack of information sufficient to name IHS officials whom Plaintiffs may assert are "bad men" under the Treaty for their concealment of or failure to report Dr. Weber's prior acts of child sex abuse.  Hr'g Tr. at 23:1–5, 15–20, ECF No. 25.  Although Plaintiffs may not know the identities of *all* IHS officials who are allegedly "bad men," the materials submitted with their opposition brief identifies some IHS officials and employees who, as a result of the criminal investigations and news reporting, publicly stated (some under oath) that they suspected Dr. Weber of sexually abusing young patients before and after his transfer to Pine Ridge and reported their concerns up the chain at IHS.  *See, e.g.*, ECF No. 11 at 9–17; ECF No. 11-2 at 8–10 (Dr. Daniel Foster; describing concerns he had regarding Dr. Weber while they worked together in the IHS hospital in Browning, Montana, in the early- to mid-1990s, which he expressed to hospital officials Mary Ellen LaFromboise and Margene Tower); *id.* at 15–16 (former Browning IHS hospital CEO Mary Ellen LaFromboise; acknowledging that concerns were relayed to IHS officials regarding the "traffic of young people in and out of Dr. Weber's quarters"); *id.* at 18–19 (former IHS clinical director Dr. Randy Rottenbiller; conceding that Ms. LaFromboise's report of an incident caused an unnamed IHS official to characterize Dr. Weber as "a pedophile" because of the physician's behavior in Browning); *id.* at 257 (Dr. Mark Butterbrodt; contending that he "[t]ried for the better part of 15 years to bring [Dr. Weber's] activities to the attention of the FBI, the Indian Health Service, the South Dakota State Board of Licensing, Tribal Council, journalists, anybody [he] could think of").

Counsel also conceded that he "know[s] enough" from available evidence "to say that . . . there are IHS officials who had information about [Dr. Weber], and those officials would then have criminal reporting duties."  Hr'g Tr. at 23:20–24.  Additional officials may be identified through discovery, at which point Plaintiffs could seek to amend the Complaint to assert additional "bad men" allegations.  *Id.* at 23:15–17.  But first they must assert a valid claim based on the actions (or inaction) of IHS officials.  Only then is discovery available.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (pleading requirements ensure that the "doors of discovery" are not unlocked until a plaintiff files a complaint that survives dismissal) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).

Defendant proactively asserts that any claim against IHS officials would fail to state a claim upon which relief can be granted.  *See* ECF No. 15 at 20–22.  The Court is not in a position on the briefs before it to resolve that question.  Defendant's argument was, understandably, raised in its reply, and Plaintiffs have not had the opportunity to fully respond.  Because the Court's ruling on the jurisdictional question at issue in the instant motion does not dispose of any "bad men" claim against other IHS officials, the Court will permit Plaintiffs to move for leave to amend their Complaint in accordance with RCFC 15(a)(2).  The Court will consider Defendant's futility argument, and any other grounds raised, after full briefing and review of the proposed amended pleading.

### III. CONCLUSION

For these reasons, the Court **GRANTS** Defendant's Motion to Dismiss (ECF No. 7) pursuant to RCFC 12(b)(1) for lack of jurisdiction insofar as the claim asserted in Plaintiffs' Complaint is based on the wrongs committed by Dr. Weber.  Plaintiffs may file a motion for leave to amend the Complaint to assert a claim against any other "bad men" who allegedly concealed or

failed to report Dr. Weber's history of child sex abuse **by no later than April 8, 2022**.  Plaintiffs

shall attach a copy of the proposed amended complaint to any such motion.

      **SO ORDERED.**

Dated: March 9, 2022                   <u>*/s/ Kathryn C. Davis*</u>
                                           KATHRYN C. DAVIS
                                           Judge